## The Citizens' Bank *v.* Dennistoun et al.

A transaction entered into on documents which are subsequently discovered to be false, is null *in toto*. In such a case it is immaterial to enquire to what extent those false documents may have been the moving or determining cause of the transaction. C. C-3048.

A PPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. The facts of this case are stated at length in the opinion of the court *infrá*. *Grima, Pierce* and *Roselius*, for the plaintiffs. *Briggs* and *Grymes*, for the appellants. The judgment of the court was pronounced by

Eustis, C. J. The defendants, together with several other merchants of the city, had claimed a large quantity of cotton, which had been purchased by *Vincent Nolté*, in 1839. Their claims were contested by the plaintiffs, who asserted a superior right on the same cotton, which was then held under judicial process. After ineffectual attempts to release the cotton from the custody of the law the parties entered into a compromise. This compromise is in writing, and was concluded and signed on the 8th of May, 1839.

By its conditions the suits were to be discontinued at the costs of the parties; all ulterior claims resulting from the transactions which were the subject of the arrangement were waived; the rights of the bank to all advances made on the cotton were recognized; the bank was to discount the drafts of *Nolté* for the amount due by him to each of the parties, which drafts were to be endorsed by the party with a waiver of protest and notice; the cotton was to be delivered to the bank to be forwarded to its destination; the debt thus contracted to the bank was to be paid out of the proceeds of the cotton; and the parties bound themselves to make good any deficiency, each in his due proportion. The cotton was delivered to the bank accordingly; the drafts were taken, and the money paid.

The present action, which was instituted in 1842, is to recover from the defendants the sum of $121,512 53, alleged to be the balance, including interest, due on advances under this arrangement, after crediting them with the proceeds of the cotton, less the advances made by the bank to *Nolté*. The cause was tried before a special jury of merchants on two occasions without the jury in either case agreeing in a verdict, and was finally determined under an agreement of counsel submitting it to the judge of the Fifth District Court of New Orleans, who had presided at the jury trials. He rendered judgment against the defendants for $65,004 45, with interest; and from this judgment the present appeal is taken by the defendants. The bank in its answer on the appeal asks for a change in the judgment, giving the whole amount claimed in the petition.

The defendants admit the advance to them of $92,000 on *Nolé's* drafts. They allege that they were induced to sign the compromise and relinquish their claim upon the cotton by fraudulent representations made to them, that the cotton upon which they had a lien was pledged to the bank, when in fact the cotton was not pledged to the bank. They claim credit for the proceeds of one thousand bales of cotton, being a part of two thousand four hundred and seventy-one bales bought by *Nolté* from *Yeatman & Co.*, and designated as the cotton *per John Randolph*.

The truth or falsity of the representations under which the defendants en-

tered into the compromise by which their claims on the cotton were relinquish-
ed, rests upon the fact of the acts of pledge in the books of the bank having
been executed at the time they bear date, or afterwards, and antedated.    The
district judge did not decide the case upon this contested question of fact, but
settled the accounts between the parties independent of the compromise, al-
lowing the defendants credit for the amount of their advance on the one thou-
sand bales of cotton, on the ground that the bank had no legal possession of
that parcel, which was essential to the validity of the pledge.

The facts in relation to these one thousand bales appear to be as follows:
On the 14th of April, 1839, *Nolté* bought of *Yeatman & Co.*, two thousand
four hundred and seventy-one bales of cotton.    The purchase was to be con-
sidered as for cash, but no money was paid, and the payments were fixed at six
different terms, from the 20th of April to the 15th of May, both inclusive.
The cotton was not delivered.    *Nolté's* broker procured from the cotton press
into which the cotton was taken from the landing, three receipts bearing date
severally the 16, 17, and 18th of April.    These receipts, two of which signed
by the pressman, and one by his clerk with his authority, acknowledged to have
received, on the days of the date. from *Nolté*, the number of bales specified
and marked, and to hold them subject to the order of the cashier of the Citi-
zens' Bank.    At all of these dates there is no evidence that the quantity of
cotton specified in the receipts was in the press, nor was it weighed or marked.
The receipts were all false; and were procured by *Nolté's* broker, and fur-
nished by the pressman, without any privity or consent on the part of *Yeat-
man & Co.*, to whom the cotton belonged exclusively, to the knowledge of both
broker and pressman.

The account sales, giving the weight and total price of the cotton, furnished
to *Yeatman* on the 21st, bears date the 20th, and of the same date is a receipt
of the pressman acknowledging to have received the cotton for account of
*Yeatman*, which puts this fact beyond all question.

On the 20th, *Yeatman & Co.* gave an order on the press for one thousand
bales of the cotton, and called the same day to receive the first payment,
$25,000.    There appears to have been some difficulty or delay on the part of
*Nolté*, but the defendants gave *Yeatman* a check for $25,000 in favor of *Nolté*,
which was endorsed by him and paid on the 22d.    This sum was advanced on
the order given by *Yeatman & Co.*, was in favor of *Nolté* or his order, and
bore the endorsement of *Nolté*.    On the 25th the suit of the defendants against
*Nolté* was commenced, for the sequestration of the cotton on which they had
made advances.    It is not proved that the order was notified to the pressman
before monday, the 22d, and the plaintiffs contend that it was not notified until
after this sequestration.    *Yeatman* had, on the 23d, commenced proceedings
against the whole lot of cotton, and was made defendant, with *Nolté*, in the
suit of the *Dennistouns*.    In both of these suits the bank intervened, and
claimed the cotton.    The intervention in the *Dennistoun* suit had for its object
the setting aside of the sequestration as to two thousand and thirty-seven bales,
the sequestrations having covered the whole lot *per John Randolph*.    The pe-
tition based the rights of the parties upon advances made to *Nolté* on the cotton,
and its being in their possession, under certain acts of pledge executed by
*Nolté*.

This statement places before us the antagonist pretensions of the plaintiffs
and defendants on this cotton, which was delivered to the former under the
compromise of which we have spoken; and we purpose first to examine the

correctness of the decision of the district judge as to the respective rights of the parties previous to the compromise.

The petition of the bank charges the advances to have been made to *Nolté* on his two drafts, dated the 17th of April on *Baring, Brothers & Co.*, forming an aggregate of £16,800, to secure the acceptance of which *Nolté* delivered the cotton, and pledged the same to the bank, *as will appear by the deeds of pledge themselves subscribed by said Nolté*, and that the advance made by the *Dennistouns* on the 20th, was three days after the cotton was delivered and pledged as aforesaid to the bank.

It can hardly be urged that the possession of *Yeatman & Co.*, who were the owners of the cotton, could be affected by the acts of *Nolté*, or of his agents. The rights of the bank are derived from *Nolté*, and he having no claims on the cotton until it was paid for or until the vendors chose to give him the control of it by delivery, it follows, as a matter of course, that, by virtue of the receipts above mentioned, the bank had in no sense possession of the cotton.

The argument of the counsel for the plaintiffs is, that *Nolté* acquired the possession under the order of the 20th from *Yeatman & Co.*, and that this possession inured to the benefit of the plaintiffs, in as much as the defendants never gave notice of the order to the pressman until after the sequestration, which took place on the 25th and the receipts in terms asknowledge the possession of the bank. The order is to this effect:

"Messrs. Tilghman & Barnes: Deliver *Vincent Nolté*, or order, one thousand bales of cotton out of the lot of two thousand four hundred and seventy-one bales, received *per steamboat John Randolph*, and oblige.

(Signed)  "YEATMAN & CO."<br>(Endorsed)  "VINCENT NOLTE."

"New Orleans, 20 April, 1848."

But if notice to the pressman of the order was necessary to give the *Dennistouns* possession of the cotton, it was equally necessary for *Nolté* to give notice in order to give him possession of it. No such notice was given by *Nolté*, and, according to the argument, the possession remained in *Yeatman & Co.* up to the time of the sequestration by the *Dennistouns*, in which the pressman were made defendants. The possession of the original owner was uninterrupted and not changed until that event, and the bank never had possession until the cotton was given up under the compromise.

The right of the *Dennistouns* to hold the cotton adversely to the bank under article 3214 of the Civil Code being thus established by the advance and the possession, we find that this right was abandoned in favor of the bank under the compromise. The questions raised as to the validity of the compromise must necessarily be determined; for, if it be valid, the bank retains its paramount claims secured by it; and if the compromise be set aside, the parties must be restored to their original rights as they existed previous to and independent of it.

The article of our Code just quoted, which provides for the security of the commission agent or consignee for his advances on goods consigned to him, requires that the goods should be delivered to him, or, in a case of this kind, to use the words of the article, that they be at his disposal in his stores or in a public warehouse.

Questions concerning the symbolical delivery of merchandize are so important in their consequences upon the operations of commerce that, inasmuch as there is no necessity for it, we must not be understood as deciding that under

the evidence in this case the delivery was perfect to either of the parties. The bank hold under the possession of the *Dennistouns*, and have no rights under *Yeatman* adverse to the defendants. They took the cotton, without any subrogation, under the compromise, to the claims of *Yeatman* against the defendants; and they cannot now contest the possession under which they hold, without showing a superior right to it anterior to the compromise. It, therefore, does not become necessary to determine on the perfectness of the possession by the defendants, under the order for the one thousand bales, previous to the sequestration, under which the whole lot was taken and delivered to the bank.

CITIZENS' BANK<br>*v.*<br>DENNISTOUN.

It will be seen by the petition of intervention of the bank in the sequestration suit of the *Dennistouns* that. its claims to the cotton was based upon the delivery and pledge of the two thousand and thirty-seven bales, " as will appear by the deeds of pledge themselves, subscribed by said *Nolté*," to use the language of the petition. These acts of pledge, which are before us in the originals, purport to have been executed, on the 15th, 16th and 17th April, respectively.

*Nolté*, who was examined as a witness under a commission in the city of Trieste, states that these acts of pledge were altogether an afterthought, and were all signed together at his rooms, on sunday, the 21st, the day intervening between the advance of the $2,500, on the 20th, by the *Dennistouns*, and the notice to the pressman on monday, the 22d. As to this fact of the antedating of these acts, counter testimony has been offered. We have stated that this cause had been tried before two special juries without any result, and from the complexion of the whole evidence, we take it that this point was the obstacle. The district judge so considered it, and, under the view of all the difficulties which it presented, has given his opinion fully upon it, though he did not decide the case upon the point. Having presided at the two contested trials, and having heard the witnesses, some of whom were twice examined in open court, his opinion upon the issue of fact, whether the acts were antedated or executed at the time they purport to be, is entitled to great weight, and we should not be justified in overlooking it and acting on our own, unless that opinion was evidently erroneous.

The principal argument presented by the plaintiffs against the effect of *Nolté's* evidence is that, he is unworthy of belief, in consequence of the frauds he committed in these transactions, and the levity and discreditable manner in which his testimony is delivered. Indeed the district judge states expressly that this evidence, taken by itself, would be unworthy of the slightest attention. An extract from his opinion will give his reasons not so much for believing *Nolté*, as for believing the fact of the pledges having been antedated to be as stated by the witness.

"In various other particulars, moreover, the evidence given by *Nolté* is directly contradicted by respectable witnesses. But it so happens that the portion of *Nolté's* deposition which gives a date to the pledges of the cotton in question, different from the dates upon their face, is very remarkably corroborated by the appearance of the pledges themselves. They are not in the regular pledge book of the bank in the order of their dates, but are upon loose sheets of paper, wafered into another pledge book, which was not regularly opened until many months after the date which the pledges purport to bear. All the other pledges given to the bank by its customers are filled up in printed blank forms, bound up together in a book, and follow each other in regular rotation. The series of those printed pledges filled up and signed by the customers of the bank, is un-

interrupted in this volume, before, at, and after the dates given to the pledges in question. Why, then, were those pledges not in their proper place in the volume? A plausible, and apparently the only plausible, answer is that furnished by *Nolté's* evidence, to wit, that the pledges in question were not executed at the bank where the book was kept, nor on a day when the bank was open for business, but were in reality executed at *Nolté's* lodgings, and on a sunday. Besides this singular appearance of the instruments themselves, I cannot shut my eyes to the fact that *Nolté* did not alone sign them. They were signed by *Perrault*, the cashier, and by two witnesses, clerks of the bank. Why was not *Perrault* examined as a witness in this cause, to rebut *Nolté's* evidence on this point? One of the clerks has been examined, and his evidence *does not* contradict that of *Nolté* upon this point. He recollects signing papers at *Nolté's* rooms, but cannot say whether they were pledges or not. The witness recognizes his signature, but cannot say from his recollection at present, precisely where or when he signed. All is doubt and uncertainty. This uncertainty may very easily exist in the mind of a person who has had no other connection with an instrument than to attest the signature of a contracting party, especially after a lapse of many years; but I again must ask, why was not *Perrault* examined? His connection with the affair was too intimate to permit us to doubt that he has a recollection of it, and that he can give *Nolté's* story the most emphatic contradiction, if false. I do not, however, consider it necessary to decide this very difficult question of fact, upon which no less than two juries have hung already in the cause."

The force of this statement, it must be conceded, it is difficult to resist, and of its truth and accuracy we think there can be no doubt. In scrutinizing the conclusions which the district judge felt himself bound to adopt, we have carefully examined every well ascertained fact connected with this transaction in all its bearings and consequences, without having found any which are in conflict with that testified to by *Nolté*, of the antedating of the acts of pledge. No explanation is attempted to be given of the fact of the pledges not being in the regular books of the bank in the order in which the several dates would place them, and without such explanation upon what hypothesis can their being out of their proper place be accounted for, except on that which this testimony and the attending circumstances concur in establishing?

There are two additional facts which, in reference to this enquiry, may not be unimportant. On the trial of the rule in *Dennistoun's* case, taken by the bank in order to bond the cotton, *Perrault*, the cashier, was examined as a witness for the bank, and makes no allusion to the acts of pledge although the petition of intervention, as we have seen, was based upon the acts of pledge. He says, "on being shown the two drafts marked G and H, they were paid to *Mr. Nolté* as an advance on the cotton pledged to the bank; previous to the money being advanced as above stated, *the policies and receipts were transferred to the bank;* in making the advance the bales were averaged as weighing four hundred and twenty pounds, without making any estimation of the actual weight; and to arrive at the amount the bank advanced, it was valued at ten cents; part of the cotton was shipped on the *Diadem;* witness cannot recollect whether the bank issued orders for the shipment of the cotton or not; but that he generally issues orders for such shipments."

A close examination of the acts of pledge in the book of the bank, has satisfied us that three at least, and in all probability four, of them were signed at

the same time. Ink of the same consistency and the same pen were evidently CITIZENS'BANK
made use of by the person signing them, and his handwriting bears intrinsic DENNISTOUN.
signs of their being written at the same time and without interruption.

The law on the subject of compromises has been properly stated by the
counsel for the defendants. The provision of our Code that a compromise
entered into on documents which have been since found to be false, is null *in
toto*, applied to the facts disclosed and the judicial proceedings which the com-
promise was entered into in order to terminate, is fatal to its validity. To what
extent these pledges may have been a moving or determining cause of the com-
promise, we do not think it material to inquire. The defendants, it is not prov-
ed, knew that the pledges were false and antedated. The law gives no effect to
compromises on false documents, and hence the formal and positive enactment
on the subject.

The counsel for the defendants contend that if the compromise be declared
void, the defendants are entitled to the nett proceeds of the one thousand bales
of cotton which the bank has received, instead of their advance of $25,000
allowed by the district judge, and also to a credit for the commissions in Liver-
pool, which now stand in the account of the bank as a charge against them.

We must restore the defendants to the rights they had under their seques-
tration. If the bank took the cotton and sold it, it is but just that the proceeds
received should be for account of those who had a superior right to it. The
defendants have not asked to be credited with its value here, but are satisfied
with the nett proceeds of the sale in Liverpool. The allowance of the nett
proceeds of the one thousand bales appears to be a necessary result of the
*statu quo*, to which our decision on the compromise restored both parties.

The evidence authorizes the allowance of the commissions, on the same prin-
ciple. Had the cotton been left to its original destination under the consign-
ment on which the advance was made, it would have gone to the defendants'
house in Liverpool, and the commissions would thus have been saved to them.

The compromise fixed the rate of interest at seven per cent. Had it not
been for the compromise there is no reason to believe that the defendants would
have made the loan from the bank, and there is no ground on which a rate of
interest higher than the legal rate can be allowed.

As the defendants have shown no legal ground on which the balance of the
advance by the bank, after deducting the proceeds of the one thousand bales of
cotton and the commissions on the sale, was retained, they must pay interest *ex
mora* from the judicial demand. The proceeds of the cotton and commissions
are to be calculated at the value of the pound sterling by the act of Congress of
1842.

It is, therefore, decreed that the judgment of the District Court be reversed;
and it is ordered, that the plaintiffs recover from the defendants. *in solido*, the
sum of $44,133 43, with interest from judicial demand; the plaintiffs paying
the costs of this appeal, and the defendants those of the District Court.*

---

* The counsel for the appellants prayed for a re-hearing, urging: That the source of
the 3049th article of our Code is found in the law 42, title 4, of the 2d book of the Jus-
titian Code, and reads as follows: " Si ex falsis instrumentis transactiones vel pactiones
initæ fuerint, quamvis jusjurandum de his interpositum sit, etiam civiliter falso revelato,
eas retractari præcipimus: ita demum, ut, si de pluribus causis vel capitulis eædem pac-
tiones seu transactiones initæ fuerint, illa tantummodo causa vel pars retractetur, quæ ex
falso instrumento composito convicta fuerit: aliis capitulis firmis manentibus: nisi forte
etiam de eo, quod falsum dicitur, controversia orta decisa sopiatur."
Brunnemann, in his commentary on this law, uses the following language: " Si quan-

do ex falsis instrumentis judicatum sententia lata retractatur, utique etiam transactio, quando scilicet falsis instrumentis persuasus quis transegit, retractari potest etiamsi sit jurata. Sed id de iis capitibus tantum intelligendum, in quibus alter falsa instrumenta produxit, nisi sint connexa." Vol. 2, p. 130.

Duaren, commenting on the title in the roman digest, De Transactionibus, says, at page 83 of his works: " Dolus etiam probandus est, quemadmodum metum probandum esse diximus. Non enim sufficit protestari, aut dicere coram magistratu se dolo adversarii inductum esse ad transigendum nt ipsa rescindatur transactio, sed eum probari oportet dolum. Et hoc generaliter verum est."

· Godfred, in his note on the 42d law of the Code, remarks: "Jurata transactio eatenus rescinditur, quatenus prætextu falsorum instrumentorum facta est."

The modern writers are equally clear and unanimous on the subject. Article 3049 has been literally transcribed from the 2055th article of the Napoléon Code. Toullier states the rule thus: " Du reste, les transactions suivent la loi commune relativement à l'erreur de fait, qui les annulle ainsi que les autres conventions, lorsqu'elle a été la cause principale du contrat. Les articles 2055 et 2056 en offrent des exemples." Vol. 6, no. 72.

It may, perhaps, be said, that the rule of the roman law has not been adopted in the modern Codes, without considerable modifications; and that the Louisiana Code formally and distinctly declares that " a compromise entered into on documents which have since been found false, is null *in toto*." Now in what does this rule differ from that of the roman law? Simply in this, that instead of annulling the compromise only so far as it was produced by documents which have since been discovered to have been forged, and maintaining it so far as it is unconnected with them, it is annulled *in toto*. The article of our Code has not subverted the whole doctrine on this subject, by providing that it is altogether immaterial whether the compromise was made in consequence of the forged instruments or not. The law does not deal in mere abstractions, and, therefore, it is of no importance whatever whether the acts of pledge in the present case were antedated or not, unless the defendants were induced thereby to propose and execute the compromise. The provision of the Code lays down the familiar rule that fraud taints and vitiates all contracts. What is the evident meaning and import of the words of the Code " on documents, &c." ? No other than this, that the compromise must have been made in consequence of, and with reference to, documents which have since been discovered to be false or forged; in other words, that these must have been the principal, if not the sole, motive or inducement for making the compromise. In order to invalidate a compromise on the ground of fraud or error, the same rules of law apply which would govern with reference to any ether contract. One of these rules is, that " fraud as applied to contracts, is the cause of an error bearing on a material part of the contract created or continued by artifice, with a design to obtain some unjust advantage to the one party, or to cause an inconvenience or loss to the other." C. C. art 1841. The rule with regard to error is similar. C. C. art. 1835-6. We do not contend that, under art. 3049 of the Code, it is necessary to show that one of the parties was conusant of the falsity or forgery of the documents; for, even if both parties were ignorant of the fact, and acted in good faith, the compromise would nevertheless be null *in toto*. But on different grounds; if one of the parties was aware of the forgery, the contract would be annulled on the score of fraud; if not, on that of error.

Such was the view of the subject presented to the Council of State, by Bigot-Préameneu, when the 2055th article of the Napoléon Code was under discussion: " Il a toujours été de règle qu'une transaction faite sur le fondement de pièces alors regardées comme vraies, et qui ont ensuite été reconnues fausses, est nulle. Celui qui voudrait en profiter, serait coupable d'un délit, lors même que dans le temps du contrat il aurait ignoré que la pièce était fausse, s'il voulait encore en tirer avantage lorsque sa fausseté serait constatée.

Mais on avait, dans la loi romaine, tiré de ce principe une conséquence qu'il serait difficile d'accorder avec la nature des transactions et avec l'équité. On suppose dans cette loi que dans une transaction il peut se trouver plusieurs chefs qui soient indépendans, et auxquels la pièce fausse ne soit pas commune. On y décide que la transaction conserve sa force pour les chefs auxquels la pièce fausse ne s'applique pas.

Cette décision n'est point admise dans le projet de loi. On ne doit voir dans une transaction que, des parties corrélatives; et lors même que les divers points sur lesquels on a traité sont indépendans quant à leur objet, il n'en est pas moins incertain, s'ils ont été indépendans quant à la volonté de contracter, et si les parties eussent traité séparément sur tous les points.

On eût moins risqué de s'écarter de l'équité, en décidant que celui contre lequel on se serait servi de la pièce fausse aurait l'option, ou de demander la nullité du contrat en entier, ou d'exiger qu'il fût maintenu quant aux objets étrangers à la pièce fausse; mais la règle générale que tout est corrélatif dans une transaction, est celle qui résulte de la nature de ce contrat; et ce qni n'y serait pas conforme ne peut être exigé par celui même contre lequel on s'est servi de la pièce fausse.

And in the report made by the tribune Albisson, on the same occasion, we read:

" Mais il est d'autres cas où elle est entièrement nulle, ou tout au moins sujette à re-

scision ; et ce sont ceux qui peuvent faire anéantir un jugement en dernier ressort, auquel CITIZENS'BANK
l'article 2052 assimile la transaction.                                    *v.*

Telle est, d'après la disposition de l'article 2055, la transaction faite sur pièces qui ont DENNISTOUN.
été depuis reconnues fausrss.   Dol d'une part, erreur de l'autre : un accord qui n' aurait
pas d'autres éléments ne saurait subsister ; aussi le projet le déclare-t-il entièrement nul."

Again the tribune Gillet said :

" Ainsi les jugements définitifs sont annulés lorsqu'il y a eu falsification des pièces,
ou rétention malicieuse de celles qui pouvaient éclairer la décision : les mêmes circon-
stances doivent donc faire annuler la transaction."

We contend that, it is very material to inquire to what extent the pledges have been
the moving or determining cause of the compromise. If the pledges exercised no material
influence on the minds of the defendants in making the compromise, they cannot now
claim its nullity because the pledges were antedated.

It is shown by the evidence introduced by the defendants themselves, before the Com-
mercial Court, several days before the compromise was proposed by them, that they knew
perfectly well that the cotton had not been delivered to the bank, and that, therefore, the
acts of pledge were not worth the paper on which they were written. Possession is of
the essence of the contract.  C. C. art. 3119.  As the pledges, then, were absolutely and
radically null and void, for the want of delivery and possession of the cotton attempted
to be covered by them, how can it be pretended that they could be rendered still more so
by being antedated ?   No degree of nullity of a pledge is imaginable beyond that resulting
from the absence of possession.  The parties so understood it, for the compromise was
not made on the pledges ; no mention of, or allusion to them, is made either in the propo-
sitions for a compromise, or in the contract itself.               *Re-hearing refused.*